[No. D055965. Fourth Dist., Div. One. Feb. 3, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DENNIS KEEPER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exceptions of parts I, III, IV and V.

COUNSEL

Koryn & Koryn and Daniel G. Koryn for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**McCONNELL, P. J.—**

## INTRODUCTION

A jury convicted Michael Dennis Keeper of attempted willful, deliberate, premeditated murder (Pen. Code,[1] §§ 664, 187, subd. (a), 189; count 1), assault with a firearm (§ 245, subd. (a)(2); counts 2 & 4), making a criminal threat (§ 422; count 3), and evading an officer with reckless driving (Veh. Code, § 2800.2, subd. (a); count 5). As to count 1, the jury found true an allegation Keeper personally discharged a firearm causing great bodily injury (firearm discharge enhancement). (§ 12022.53, subd. (d).) As to counts 2 through 4, the jury found true allegations Keeper personally used a firearm (firearm use enhancement). (§ 12022.5, subd. (a).) As to count 2, the jury also found true an allegation Keeper personally inflicted great bodily injury causing permanent paralysis. (§§ 12022.7, subd. (b), 12022.9.)

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

The trial court sentenced Keeper to a term of life in prison with the possibility of parole for count 1, plus 25 years to life for the related firearm discharge enhancement. The trial court additionally sentenced Keeper to a prison term of three years for the assault with a firearm conviction in count 4 plus four years for the related firearm use enhancement, and concurrent prison terms for counts 3 and 5 and for the firearm use enhancement related to count 3. The court stayed the execution of sentence for count 2.

Keeper appeals, contending the trial court committed instructional error by (1) refusing to give an instruction on attempted voluntary manslaughter; (2) refusing to give an instruction on the consideration of testimony by a person with a mental disability; and (3) failing to limit the flight instruction to counts 1 through 4. In addition, Keeper contends the court erred by imposing a concurrent sentence for count 3 rather than staying it under section 654. He also contends his sentence of 25 years to life for the firearm discharge enhancement constitutes cruel and unusual punishment, and that there are errors in the abstract of judgment requiring correction.

The People concede the trial court should have stayed the sentence for count 3 and there are errors in the abstract of judgment requiring correction. We agree and as modified, we affirm the judgment in all other respects.

## BACKGROUND

*Prosecution Evidence*

*Jennifer L.'s Version of Events*

Keeper and Jennifer L. (Jennifer) once dated and have a teenage son, B. Jennifer later married Matthew L. (Matthew) and they have two young children.

Keeper had visitation rights with B. every Wednesday, plus every other weekend. In recent years, Keeper was often unable to pick up B. for visits because he lacked a job or car; however, Jennifer dropped B. off whenever Keeper had time to see him. They did not have many disagreements regarding visitation until B. became a teenager and no longer wanted to spend as much time with Keeper, which frustrated Keeper.

In December 2008, Jennifer and Matthew attended a holiday party. A neighbor babysat Jennifer and Matthew's two young children. B. planned to

stay the night at a friend's house. B. called Jennifer during the party because Keeper had called him and told him he would be picking him up for a fishing trip. B. asked Jennifer to tell Keeper he did not want to go because he had a soccer tournament.

Keeper also called Jennifer during the party and told her he wanted to pick up B. and take him on a fishing trip that weekend. Jennifer did not know about the fishing trip before that day. Jennifer explained to Keeper that B. had a soccer tournament that weekend and did not want to go on the trip. Not dissuaded, Keeper told Jennifer to get B. ready because he was going to pick him up and he hung up on her.

B. called Jennifer again. He told her Keeper called him, said he did not care about the soccer tournament, and directed him to get ready because he was coming to get him. Keeper also called Jennifer again and screamed at her. He directed her once more to get B. ready because he had the fishing trip planned and he was going to pick up B. This time, Jennifer hung up on him.

B. called Jennifer a third time. He was crying and concerned about the way Keeper was acting toward him. Jennifer shared B.'s concern. She told B. to go to his friend's house right away. She also called the babysitter and told the babysitter not to answer the door and to call the police if Keeper came by. Matthew was not involved in any of the phone calls.

On the way home from the party, Jennifer received a text message from the babysitter stating, "Your ex is here. He knocked on the door and I told him no one was home." A few minutes later, when Jennifer and Matthew turned onto their street, Jennifer saw Keeper's van parked in front of their house. Keeper and his friend, Steve Callihan, were talking nearby.

Jennifer and Matthew parked behind Keeper's van and stayed in their car. Keeper noticed Jennifer and walked up to the car. When Jennifer got out, Keeper asked her where B. was. Jennifer told Keeper that B. was staying at a friend's house and had a soccer tournament the next morning. Keeper told Jennifer to call B. and tell him to come home because they were going on a fishing trip. Jennifer called B. to appease Keeper. B. told Jennifer he was not coming home. Jennifer relayed B.'s response to Keeper. As she did so, B. could hear Keeper swearing in the background. B. told Jennifer to hang up and call the police. B. also called the police.

Around this time, Matthew got out of the car and asked Jennifer if she was okay. Keeper told Matthew the matter was none of Matthew's business. Matthew said, "Look, man. Calm down. B. doesn't want to go with you." As this exchange occurred, Jennifer dialed 911. Keeper swore at Matthew and

told him again the matter was none of his business. Matthew replied, "Yes, it is. I take care of him. I pay his bills. I feed him."

At this point, Callihan stepped between Keeper and Matthew and told Keeper to calm down. Keeper pushed Callihan away, then pulled a gun, and pushed it against Matthew's chest. Keeper kept telling Matthew to mind his own business. Matthew put his hands up in the air and started walking backwards, saying as he did, "Man, do you really want to do this? Is it really worth it?" Keeper kept swearing at Matthew and shoving the gun at him. Keeper fired two shots at Matthew and Matthew fell to the ground. Keeper then walked over to him and fired more shots at him. Jennifer ran to Matthew. Keeper pointed the gun at her and asked, "Do you want to die, too?"

Upon hearing approaching sirens, Keeper lowered the gun and ran to his van. He called out to Callihan to "come on," but Callihan put up his hands and said, "No way, man." Keeper then drove away.

### Callihan's Version of Events

Callihan's perception of events varied from Jennifer's in some key respects. Callihan testified Keeper's wife had asked him to go with Keeper to make sure Keeper did not get into any trouble. On the way to Jennifer and Matthew's house, Keeper angrily told Callihan that he was picking up his son and Matthew "better not get in my face." Callihan tried to calm Keeper down. He did not know Keeper had a gun with him.

Keeper pulled out the gun after Callihan had stepped between Keeper and Matthew. Keeper pointed the gun at Matthew's head and then at Matthew's chest. Matthew told Jennifer to call 911. Matthew asked Keeper, "What are you going to do? Shoot me?" Matthew then said, "Go ahead and shoot me. Shoot me." Matthew kept saying this over and over.

Matthew started backing up while continuing to dare Keeper to shoot him. Keeper put the gun down, then Matthew pushed him and Keeper put the gun back up. Callihan kept telling Keeper, "It's not worth it." Keeper put the gun down again, but Matthew grabbed the hand holding the gun and pulled it to his chest. A few seconds later, a shot fired and went into Matthew's leg. Then, a second shot fired and went into Matthew's chest. Matthew fell to the ground. A few seconds later, Keeper shot Matthew in the face. Jennifer ran over to Matthew. Keeper never said anything to her and never pointed the gun at her.

Afterwards, Keeper told Callihan to get in the van with him, but Callihan declined and Keeper drove off without him. Callihan never told the police

about Matthew pushing Keeper, about Matthew pulling Keeper's gun hand to his chest, or about the sequence of shots.

### Police Pursuit

Two police officers spotted Keeper's van as he was leaving the area. Although the officers activated the emergency lights and sirens on their patrol car, Keeper did not stop. They and other police vehicles, as well as a police helicopter, pursued Keeper. During the pursuit, Keeper ran multiple red lights, changed lanes multiple times, drove at unsafe speeds, and nearly caused a collision. The pursuit ended approximately 10 to 12 miles from where it began, when Keeper stopped the van on a freeway onramp after the van's transmission became disabled.

Officers found a .357 Magnum on the front floorboard of the van. The gun contained five expended rounds and one live round. The officers also found multiple rounds of live ammunition in an open case in the backseat of the van.

### Matthew's Injuries

Matthew sustained multiple gunshot wounds to his head, neck, chest, back, abdomen, and knee. The bullet fragments caused bleeding in his brain and fractures in three parts of his spine. His injuries resulted in permanent neurological loss, severe spinal cord damage, and quadriplegia.

## Defense Evidence

### Keeper's Version of Events

After Keeper and Jennifer broke up, they set up a visitation schedule for B. The two never argued over visitation. In addition, Keeper got along with Matthew and never had any problems with him.

Approximately eight months before the shooting, Keeper left his job as a certified nurse assistant caring for the elderly. He left the job because he had to "clean up dead people all the time" and "it started to get to me, watching people die when I knew them." He went on disability leave and did not work again.

Keeper suffered from depression for several years. Shortly before the shooting, he was diagnosed with posttraumatic stress, his wife was diagnosed with fibromyalgia, and one of his other children was diagnosed with autism.

He was feeling "really depressed." Although he had been taking antidepressant, antianxiety, and other medications, he stopped taking the medications a week prior to the shooting because he wanted to feel normal.

Keeper told B. about the fishing trip about two weeks before the shooting. He thought he also told Jennifer about it. Throughout the day of the shooting, Keeper felt very depressed. He yelled at Jennifer and B. on the telephone because he was frustrated and believed Jennifer and Matthew were telling B. not to go on the fishing trip with him.

Prior to going over to Jennifer's house, Keeper picked up Callihan to make sure nothing would happen. While driving to Jennifer's house, Keeper told Callihan that Matthew "better not get in his face." Although Jennifer had already told Keeper that B. would not be going on the fishing trip, Keeper thought she would change her mind if he went to her house.

About a month earlier, Keeper found a case while cleaning out a garage. Thinking it contained tools, he put the case in his van. Earlier on the day of the shooting, Keeper opened the case for the first time and discovered it contained a gun. Keeper kept the gun in the van because he did not want it inside his house around his other children.

When Keeper arrived at Jennifer and Matthew's house, he put the gun in his pants pocket because he did not want B. to be near it. Keeper did not intend to use the gun.

After the babysitter told Keeper that B. was not there, Keeper returned to his car intending to wait a few minutes before going home. When he noticed Jennifer, he approached her and she told him B. did not want to go with him. He insisted on seeing B. and yelled at Jennifer.

Matthew got out of the car and told Keeper that B. was not going with him. Keeper told Matthew the matter did not concern him and Matthew yelled back that B. was not going anywhere because Matthew "pa[id] for his stuff, clothes and everything." Matthew threatened and pushed Keeper.

Keeper reached into his pocket for his cell phone to call 911 for help in enforcing the visitation; however, his cell phone was not in his pocket. Instead, he pulled out the gun. When Matthew saw the gun, he said, "Are you gonna shoot me? Are you gonna shoot me?" Keeper put the gun down, but Matthew grabbed Keeper's hand and pulled it up so the gun was pointed at Matthew's chest. Matthew let go and Keeper put his hand back down. Keeper turned toward Matthew and Matthew tried to grab the gun from Keeper. When Keeper

tried to pull away, he accidentally fired the gun twice. Keeper never intended to kill Matthew and did not aim the gun at Matthew's chest or face.

After Keeper fired the first two shots, he "blanked out." He did not remember firing three more shots and did not remember threatening Jennifer. His next memory was of driving on the freeway. He realized Callihan was no longer in the van. He saw police lights in his rearview mirror, so he stopped driving. On cross-examination, Keeper acknowledged that he did not remember many of the things that happened, and that his version of events might not be accurate.

### Keeper's Mental and Neurological Impairments

Dr. Mark Lewkowicz, a clinical psychologist, evaluated Keeper and diagnosed him with bipolar disorder. In addition, Dr. Lewkowicz concluded Keeper has an I.Q. of 77 and a neurological impairment consistent with a language learning disability. Dr. Lewkowicz explained that Keeper has difficulty organizing information, sequencing ideas, and using language for complex reasoning and planning. Dr. Lewkowicz further explained that, when someone with depression stops taking depression medication, the person will gradually become more depressed and less resilient, and develop a sense of hopelessness in life.

### Keeper's Character Evidence

Callihan's ex-wife, Keeper's former work supervisor, and Keeper's martial arts instructor testified Keeper was a peaceful, honest person.

## DISCUSSION

### I*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II

During the jury instruction conference, defense counsel requested that the trial court give the CALCRIM No. 331 instruction.[2] The trial court declined

---

*See footnote, *ante*, page 511.

[2] CALCRIM No. 331 states: "In evaluating the testimony of a person with a (developmental disability[,]/ [or] [a] (cognitive[,]/ [or] mental[,]/ [or] communication) impairment), consider all of the factors surrounding that person's testimony, including his or her level of cognitive development. [¶] Even though a person with a (developmental disability[,]/ [or] [a]

to give the instruction, finding it did not apply to the facts of the case. Keeper contends the failure to give the instruction requires reversal of his conviction because the instruction was necessary for the jury to properly evaluate his credibility. We conclude there is no merit to this contention.

In a criminal case in which a person with developmental disability, or a cognitive, mental, or communication impairment, testifies as a witness, the trial court must, upon request, instruct the jury to consider all of the factors surrounding the person's testimony, including the person's level of cognitive development, when the jury evaluates the person's testimony. (§ 1127g.) In addition, the trial court must instruct the jury that, even though the person's disability or impairment may cause the person to perform differently as a witness, the difference does not mean the person is a more or less credible witness. (*Ibid.*) The trial court must also instruct the jury not to discount or distrust the person's testimony solely because of the person's disability or impairment. (*Ibid.*) A trial court fulfills this obligation in appropriate cases by giving the CALCRIM No. 331 instruction, which tracks the language of section 1127g.

(2) Section 1127g does not define "developmental disability" or "cognitive, mental, or communication impairment." When the meaning of a statute is unclear, " 'we look to a variety of extrinsic aids, including the objects to be achieved, the evils to be remedied, legislative history, the statutory scheme of which the statute is a part, contemporaneous administrative construction, and questions of public policy.' " (*People v. Ramirez* (2009) 45 Cal.4th 980, 987 [89 Cal.Rptr.3d 586, 201 P.3d 466].)

The Legislature enacted section 1127g in 2004 as part of an Assembly bill that made " 'numerous changes to the Penal Code, Evidence Code, and the Welfare and Institutions Code to protect dependent persons and the elderly in court.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 20 (2003–2004 Reg. Sess.) as amended Aug. 18, 2004, p. 7.) The bill's author particularly sought " 'to protect the rights of crime victims who are dependent on others for their care because of a developmental disability, traumatic brain injury, or degenerative brain disease' " by ensuring " 'dependent people who are called upon to testify in a court of law are given the rights afforded to minors in the same situation.' " (*Ibid.*)

(cognitive[,]/ [or] mental[,]/ [or] communication) impairment)[,] may perform differently as a witness because of his or her level of cognitive development, that does not mean he or she is any more or less credible than another witness. [¶] You should not discount or distrust the testimony of a person with a (developmental disability[,]/ [or] [a] (cognitive[,]/ [or] mental[,]/ [or] communication) impairment)[,] solely because he or she has such a (disability/ [or] impairment)."

■ The Legislative Counsel described the Legislature's intent more broadly as "ensur[ing] that people who cannot live independently are treated fairly by the criminal justice system." (Legis. Counsel's Dig., Assem. Bill No. 20 (2003–2004 Reg. Sess.) chaptered Sept. 28, 2004, p. 3.) Section 1 of the bill reflects this intent and states the purpose of the legislation is to protect "the rights of developmentally disabled persons *and other dependent persons* who are witnesses in criminal cases . . . ." (Assem. Bill No. 20 (2003–2004 Reg. Sess.) § 1, italics added; see Stats. 2004, ch. 823, § 1; Historical and Statutory Notes, 29B pt. 1 West's Ann. Evid. Code (2011 supp.) foll. § 177, p. 11.) "Dependent persons" in this context are persons whose disability or impairment substantially restricts their ability to carry out normal activities or to protect their rights. (Evid. Code, § 177.)[3]

■ It is apparent from the legislative history and the definition of "dependent persons" that the Legislature intended section 1127g to apply to persons whose developmental disability, or cognitive, mental, or communication impairment, causes them to be dependent on others for care. While Keeper presented evidence his mental disorder and neurological impairment affected some aspects of his life, he did not present any evidence his disorder and impairment caused him to be a dependent person. To the contrary, the evidence shows that, despite his disorder and impairment, Keeper generally engaged in normal daily activities without assistance. Therefore, we conclude the trial court did not err in declining Keeper's request for the CALCRIM No. 331 instruction.

III–V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is modified to stay execution of sentence for count 3 pursuant to section 654. The superior court is directed to amend the abstract of judgment to reflect this modification. The superior court is further directed to amend the abstract of judgment to delete the two references to the sentences for counts 2 through 5 running concurrently with the sentence for count 1, and to indicate instead that the sentence for count 4 runs consecutively to the sentence for count 1, and the sentence for count 5 runs

---

[3] Evidence Code section 177 was enacted at the same time and as part of the same Assembly Bill as Penal Code section 1127g. (Assem. Bill No. 20 (2003–2004 Reg. Sess.) § 2; Stats. 2004, ch. 823, §§ 2, 15.)

*See footnote, *ante*, page 511.

concurrently with the sentence for count 1. The trial court is directed to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Huffman, J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 11, 2011, S191312.