Filed 4/18/16  P. v. Smith CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C079212 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF14397) |
| v. | |
| JIMMY DON SMITH, | |
| Defendant and Appellant. | |

A jury found defendant Jimmy Don Smith guilty of forcible rape and forcible sexual penetration.  (Pen. Code, §§ 261, subd. (a)(2), 289, subd. (a)(1)A).)[1]  Defendant later admitted a strike allegation that also qualified as a prior serious felony (residential burglary, § 459), and five separate prison term allegations, in exchange for dismissal of a sixth prison term allegation (§§ 667, subds. (a), (b)-(i), 667.5, subd. (b), 1170.12, 1192.7,

---

[1] Further undesignated statutory references are to the Penal Code.

1

subd. (c)(18)). The trial court sentenced defendant to prison for 41 years, and defendant timely appealed.

The victim was developmentally disabled, and this fact forms the basis of two of defendant's four contentions. Defendant first contends the trial court erred in allowing the victim's case worker to testify about her condition, and adds that the court erred in giving a pattern instruction regarding assessing the testimony of developmentally disabled witnesses. Defendant also contends the trial court erred in admitting evidence he used drugs. Finally, he argues the trial court failed to state reasons for imposing upper term consecutive sentences. Disagreeing, we shall affirm.

## FACTS

Samantha Bumgardner testified she worked at the Alta Regional Center, which provided services for developmentally disabled people. For three years she had been the service coordinator for the victim, who had moderate mental retardation. The victim, with an IQ of between 50 and 75, could not make good choices and needed living assistance. The victim lived in her own apartment but had an independent living skills instructor who met with her weekly. Bumgardner saw her approximately every other month. The victim lived with her two young children, and had some support from family members as well.

Margarita T. testified she lived with the victim for about three or four weeks beginning in late May of 2014, along with her two children. When defendant came to the apartment, the victim told Margarita T. to send him away and say she was not there. Defendant insisted that he could come in to use the shower, and ultimately--after he spoke to the victim--came in. He seemed to be under the influence of drugs, and he followed the victim around the apartment. When the victim went to the restroom, defendant tried to rub Margarita T.'s leg. He dropped a lubricant bottle on the floor; although he denied it was his. The victim said it was not hers.

2

Margarita T. testified that at some point after he had showered and dressed, defendant went into the bathroom while the victim was inside, and he was in there for about 10-15 minutes with her. Afterwards, while defendant was still in the apartment, the victim was "teary eyed" and said defendant had "touched her." Both women told him to leave, but he would not. When the victim fell asleep on a couch, defendant said " 'Well, if you don't want nothing to do with me, then I'll be here with your friend,' as in me; referring to me [i.e., Margarita T.]. That's when he started rubbing my leg." Margarita T. was scared. Defendant made a comment about sex, and the victim had said he wanted to have a "threesome." When defendant left, the lubricant was gone. Margarita T. had told a detective that defendant had been acting " 'perverted' " and had been following the victim around the apartment.

The victim testified she was 32 and lived in a two-bedroom apartment with her two boys, aged six and 11. She received help from others with her "money and stuff" as well as with paying bills, shopping, and groceries. For about two or three weeks, Margarita T. and her children lived with the victim. During that time, defendant came by, and although the victim told Margarita T. not to open the door, she did and defendant pushed himself in. Later she testified Margarita T. told her defendant pushed his way in. The victim went into a closet because she did not want company, but eventually had to use the bathroom. When she was finished, defendant pushed her back into the bathroom. He seemed drunk and he had a bottle of sex lubricant in his back pocket. He asked the victim to ask Margarita T. to " 'have a threesome' " and the victim told Margarita T. about this comment. After defendant came into the bathroom, he put his fingers into her vagina. He pushed her down, got her pants and underwear down, penetrated her with his penis and told her he ejaculated. It hurt.

The victim testified defendant had been her friend and would come by to eat, shower, and watch television. He had never attacked her before. She first told a friend about it, but not right away because she was scared, but she thought Margarita T. must

3

have heard what happened because she was screaming. She gave her bra to a peace officer, because defendant had damaged it trying to get it off of her. She later saw defendant rubbing Margarita T.'s legs on the couch, and Margarita T. did not seem to like it.

Deputy Willy Kardatzke testified that on June 6, 2014, he went to the victim's residence to investigate a rape reported by her aunt. The victim said during the rape she cried out but Margarita T. told her "to relax and shut up." The victim said defendant had fondled her breast, put his finger in her vagina, broke her bra, and forced his penis inside her. She had since washed all of her clothing, but she gave Kardatzke the bra, which was exhibit 1 at trial.

Anthony Myers--a reluctant and partly intoxicated witness--testified defendant admitted having sex with the victim, but had said it was in his tent and part of a planned drug transaction, and Myers so informed a detective. This witness's equally intoxicated wife testified the victim told her that defendant had raped her, and the victim was mad about it.

Detective Mark Claar testified Myers told him he (Myers) had confronted defendant about the rape allegation and defendant told Myers the victim had come to his tent and offered him oral sex in exchange for drugs, which offer he had declined. When Claar interviewed the victim, who was "of lower intelligence," she told him that about three weeks previously, defendant came to her apartment and he seemed high. She told Claar details of defendant's visit to the apartment that were consistent with her previous statements: defendant had mentioned a threesome; she hid in a closet; he had some kind of lubricant; he broke her bra; he put his fingers in her vagina; and she yelled for help. She added that after defendant had sex with her, he stayed at the apartment and was "making moves" on Margarita T.

When Claar searched defendant's tent, he found a hypodermic needle. Defendant said he had last used drugs five days before. When Claar spoke with Margarita T., she

told him defendant had been "acting pervy" and following the victim around the apartment. The victim had told Margarita T. defendant had lubricant and wanted a threesome, and Margarita T. told Claar that defendant had touched Margarita T.'s leg.

## DISCUSSION

### I

### *Bumgardner's Testimony*

Defense counsel moved in limine to exclude Bumgardner's testimony in part as irrelevant and highly prejudicial. The motion partly relied on preliminary hearing testimony by Bumgardner to the effect that the victim had two children and had moderate mental retardation. The defense claimed this evidence would generate undue sympathy for the victim.

The People replied in part that the evidence would help the jury understand possible perception and communication difficulties the victim may have.

The trial court permitted Bumgardner to testify at trial, as outlined *ante*.

On appeal, defendant contends Bumgardner's testimony was unduly prejudicial, deprived him of due process, and also argues trial counsel did not effectively address it.

Here, the evidence was relevant (Evid. Code, § 210) to show the reasons why the victim allowed defendant to press into her apartment and abuse her, her delayed disclosure, and to explain her demeanor on the stand. It was not inflammatory in comparison with the victim's testimony about what defendant did to her, nor was it time-consuming or confusing. (See Evid. Code, § 352.) In such circumstances, the trial court acted well within its discretion in denying the in limine motion, and nothing about the ensuing trial showed that that ruling proved prejudicial.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'The prejudice which exclusion

5

of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) Here there was no prejudice.

To the extent defendant recasts his contention as a federal due process claim, and goes so far as to fault trial counsel for not making an explicit federal objection, "when evidence is properly admitted under the Evidence Code, there is no violation of due process." (*People v. Johnson* (2015) 61 Cal.4th 734, 763; see *People v. Kelly* (2007) 42 Cal.4th 763, 787; *People v. Partida* (2005) 37 Cal.4th 428, 439.) Accordingly, defendant's federal claims of error are not persuasive.

II

*Defendant's Intoxication*

Defendant contends the trial court erred in permitting the introduction of evidence that he was intoxicated at the time of the alleged crime, evidence that a syringe was found in his tent, and the fact that he admitted drug use to Detective Claar.

Before trial, the People sought an order permitting--upon the showing of a proper foundation--the introduction of evidence defendant was intoxicated and had admitted recent drug use, to corroborate other testimony about his demeanor that day. Defense counsel filed a written statement of no objection. The victim and Margarita T. testified defendant was intoxicated, though not necessarily on drugs, and Detective Claar testified that some time after the alleged rape, he found a needle in defendant's tent and defendant said he had used some unspecified drug five days previously. The defense lodged no objections to any of this testimony.

Appellate counsel recognizes that the issues raised on appeal were not preserved by timely objection in the trial court, and claims trial counsel was ineffective because there was no reason *not* to object. We disagree with this view.

6

As for the evidence of defendant's intoxication at the time of the crime, an objection would have been futile because the evidence was relevant to explain defendant's near-forcible entrance, refusal to leave, and "pervy" behavior. It was directly relevant to the circumstances surrounding the commission of the crime. Further, part of the defense strategy was to suggest the victim had willingly traded drugs for sex with the defendant in the past, and that certain witnesses lied to punish defendant for giving the victim drugs. Therefore, evidence that defendant used drugs at the time of the alleged offense, had a syringe in his tent, and admitted drug usage to Detective Claar advanced part of the defense theory. Thus, trial counsel had a plausible tactical reason for not objecting to the evidence about drugs. Where the record shows trial counsel's actions reflected reasonable tactical choices, defendant's claims of ineffective assistance are unavailing on direct appeal. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) Therefore the failure to object forfeits the claim of evidentiary error in this appeal. (See Evid. Code, § 353, subd. (a) [an evidentiary objection must be timely and specific]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1171.)

Accordingly, the contention of error is not preserved.

III

*CALCRIM No. 331*

Defendant contends the trial court erred in giving a pattern instruction regarding witnesses with developmental disabilities, because no substantial evidence supported the instruction, it improperly bolstered the victim's credibility, and it violated his federal constitutional rights. We disagree.

CALCRIM No. 331, as given in this case, provides:

7

"In evaluating the testimony of a person with a developmental disability, consider all of the factors surrounding that person's testimony, including his or her level of cognitive development. Even though a layperson with a developmental disability may perform differently as a witness because of his or her level of cognitive development, that does not mean he or she is any more or less credible than another witness.

"You should not discount or distrust the testimony of a person with a developmental disability solely because he or she has such a disability."

This instruction was given directly after the pattern instruction on how to evaluate the credibility of any witness, CALCRIM No. 226.

Section 1127g requires the court to instruct the jury about a witness's cognitive impairment, upon request, and CALCRIM No. 331 tracks the language of the statute. As is evident by the text of the instruction, it does not push the jury to believe or disbelieve a given witness's testimony. It merely directs the jury to consider a witness's cognitive level in connection with all the other factors used to evaluate any witness's testimony.

The use of CALCRIM No. 331 was upheld in *People v. Catley* (2007) 148 Cal.App.4th 500, against claims that it undermined the People's burden of proof and violated due process. (*Id*. at pp. 506-508.) Defendant acknowledges this and similar holdings but urges us to disagree with them. We decline the invitation, and for the reasons stated by *Catley* we find no infirmity in the statute or the instruction.

Defendant's subsidiary argument, that no substantial evidence supported the instruction, also fails to persuade. The evidence shows the victim had a developmental disability, and although she was able to live in an apartment, she required regular help, and therefore was a dependent person. (Cf. *People v. Keeper* (2011) 192 Cal.App.4th 511, 521 [purpose of section 1127g was to apply the instruction when a person is "dependent on others for care"].) Accordingly, it was appropriate for the trial court to give this instruction.

IV

*Reasons for Sentencing Choice*

Defendant's appellate counsel contends trial counsel was ineffective because counsel did not ask for a statement of reasons for the imposition of consecutive sentences. We disagree, because the trial court explained its reasoning in detail on the record, and in any event defendant makes no persuasive claim of prejudice.

At sentencing, the trial court emphasized the harm to the victim, noting some facts not apparent from the transcript, namely, that the victim had used a comfort dog while testifying, was visibly shaken, and had to leave the courtroom several times with the comfort dog and her support persons to "get the courage back" to continue testifying. Although the victim had helped defendant in the past by allowing him to shower at her apartment, she hid in a closet on this occasion. He was very drunk and had brought lubricant and asked for a "threesome," evidencing his lewd intent upon arrival. Between the digital penetration and intercourse, defendant had to turn the victim around "giving him an opportunity to reflect upon what he had done."

Because defendant knew the victim was vulnerable because of her mental capacity, and because he was on post-release community supervision (PCRS) at the time, the trial court imposed the upper term for the rape, eight years, doubled to 16 years for the strike, and another eight-year term doubled for the penetration count. The court then noted defendant had numerous prior adult convictions and prison terms, and his past performance on probation, PCRS, and parole had been poor, justifying the upper terms, doubled for the strike, resulting in a total base term of 32 years. Added to that was five years for the prior serious felony allegation, and four years for four of the remaining five prior prison terms, for a total of 41 years. The trial court struck the other prison term enhancement.

Later, the trial court referenced its agreement with the probation report's recommendation, and stated: "There was a clear break between Count II and Count I" and "[t]here are two separate acts. Victim is struggling, trying to keep her pants up, before Defendant rapes her. That's why I believe it's appropriate. As we have discretionary sentencing on forcible sex crimes in this matter, I'm imposing them fully and consecutively."

As the People correctly concede, under section 667.6, subdivision (c), a trial court has discretion whether to impose full consecutive terms for certain sex offenses when the crimes "involve the same victim on the same occasion." (See *People v. Belmontes* (1983) 34 Cal.3d 335, 347.) Under section 667.6, subdivision (d), however, the trial court *must* impose full consecutive terms for certain sex offenses when the crimes "involve the same victim on separate occasions." (See *People v. Jones* (2001) 25 Cal.4th 98, 104.) In determining whether the offenses occurred on "separate occasions," the trial court "shall consider whether, between the commission of one sex crime and another, the defendant has a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d).)

The trial court's comments, read in context, show that it was aware of the need to make this decision and found based on the evidence that defendant had an opportunity to reflect but resumed his sexually assaultive behavior. That finding is supported by the victim's testimony, as recounted above. Once that finding was made, full consecutive sentences were required by section 667.6, subdivision (d).

Further, the aggravating facts described *ante* far outnumbered the (zero) facts found in mitigation. There was no basis in the record for lenience. Accordingly, it is not reasonably probable the trial court would have imposed any lesser sentence, based on the

10

record and the trial court's comments, even if further reasons should have been stated on the record at the time of sentencing in this case. (See *People v. Champion* (1995) 9 Cal.4th 879, 934.)

## DISPOSITION

The judgment is affirmed.

 

/s/

Duarte, J.

We concur:

/s/

Hull, Acting P. J.

/s/

Butz, J.