Filed 6/10/21  P. v. Jackson CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CLERECE CASHAY JACKSON,<br><br>    Defendant and Appellant. | B292315<br><br>(Los Angeles County<br>Super. Ct. No. SA095843) |

APPEAL from a judgment of the Superior Court of Los Angeles County, H. Jay Ford III, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Clerece Jackson is the mother of minor quadruplets Aa., An., Ar., and Az.[1]  In October 2015, the quadruplets' teacher contacted the Los Angeles County Department of Children and Family Services (DCFS) when some of the quadruplets arrived at school with black eyes.  During the ensuing investigation, An. disclosed that appellant physically abused the quadruplets, and three of the four were found to have marks and scarring consistent with the abuse An. described.  DCFS detained the quadruplets and appellant's other minor children and initiated dependency proceedings.  The Los Angeles County District Attorney ("the People") also charged appellant with inflicting corporal injury on the quadruplets.  After Aa. and Az. ran away from their shared foster home and Az. was found with appellant, the People added charges that appellant detained Aa. and Az. from their legal custodian and violated a protective order barring contact between her and the quadruplets.

After a lengthy trial at which appellant represented herself and the quadruplets gave conflicting testimony, a jury found appellant guilty of inflicting corporal injury on An. and Ar.; detaining Aa. and Az. from their lawful custodian; and violating a protective order.  The jury acquitted appellant of inflicting corporal injury on Aa. and was unable to reach a verdict as to whether she inflicted corporal injury on Az; the People ultimately dismissed the latter charge.  The court found that appellant detained Aa. and Az. while on bail and sentenced her to three years of formal probation.

---

[1]We refer to appellant's minor children by the first letters of their first names to distinguish among them while protecting their privacy.  (Cal. Rules of Court, rule 8.90(b).)  No disrespect is intended.

2

Appellant now argues that the corporal injury convictions must be reversed because the court did not instruct the jury with either the lesser included offense of misdemeanor battery or with CALCRIM No. 331 concerning witnesses with developmental, cognitive, or mental disabilities. She contends that the abduction convictions must be reversed because the trial court deprived her of a defense and directed a verdict for the prosecution by misinstructing on the element of malice, excluding hearsay testimony regarding the alleged sexual abuse of Az. in foster care, and failing to sua sponte instruct on the defense of necessity. Appellant also argues that the trial court erred by finding she was on bail rather than allowing the jury to decide that issue and by failing to conduct an ability to pay hearing before imposing fines and fees.

We reject appellant's contentions and affirm the judgment in full.

## PROCEDURAL HISTORY

On May 29, 2018,[2] the People filed a second amended information charging appellant with four counts of felony corporal injury to a child, one count for each quadruplet (Pen. Code, § 273d, subd. (a))[3]; two counts of felony child abduction, one count for Aa. and one count for Az. (§ 278); and one count of misdemeanor violation of a protective order (§ 273.6, subd. (a)). The People alleged that the corporal injuries occurred on or

---

[2]The second amended information was filed toward the end of appellant's trial to conform the date alleged in the protective order count to proof. The original information in this case was filed on July 28, 2017, and the first amended information was filed on February 20, 2018.

[3]All further statutory references are to the Penal Code unless otherwise indicated.

between September 1 and October 12, 2015, and that the abductions and protective order violations occurred later, on or about February 24, 2017. The People further alleged, pursuant to section 12022.1, that appellant committed the child abductions while she was released on bail for the corporal injury offenses, which had been previously charged and were refiled in the instant case.

Appellant represented herself at a jury trial, which began on April 11, 2018 and continued, with some interruptions, through June 14, 2018. The jury found appellant guilty of causing corporal injury to An. and Ar., abducting Aa. and Az., and violating a protective order. It found her not guilty of causing corporal injury to Aa. and was unable to reach a verdict as to whether she caused corporal injury to Az. The court dismissed the charge of corporal injury to Az. on the People's motion. The court later found that appellant committed the abduction offenses while she was on bail, in violation of section 12022.1.

Appellant filed a motion for new trial on August 21, 2018. The court heard argument on and denied the motion during appellant's sentencing hearing on August 24, 2018.

After finding that the case was an "unusual" one "in which the interests of justice would be served if the person is granted probation" (§ 1203, subd. (e)), the court sentenced appellant to three years of formal probation with conditions including the 318 days in jail appellant already had served and had credits for, 30 days of community service, and completion of a 52-week child abuse program that satisfies the requirements of section 273.1. The court also imposed a $300 restitution fine, subject to an

4

ability-to-pay hearing (§ 1202.4, subd. (b)); a $300 probation revocation restitution fine, stayed unless probation is revoked (§ 1202.45); a court security fee of $40 (§ 1465.8, subd. (a)(1)); a criminal conviction assessment of $30 (Gov. Code, § 70373); a $500 domestic violence payment, subject to an ability-to-pay hearing (§ 1203.097); and the costs of probation, subject to an ability-to-pay hearing.

Appellant timely appealed.  She is now represented by counsel.

## FACTUAL BACKGROUND

Appellant has eight children:  adult daughter Cornesha; son To., who does not live with the family; sons Ti. and Ant.; and the quadruplets, sons Aa., An., and Ar., and daughter Az.  At the time of the events underlying the corporal injury charges, the quadruplets were 10 years old.

I.    *People's Evidence*

A.    *Corporal Injury*

Rosewood Avenue Elementary School principal Linda Crowder testified that appellant enrolled Ant., Aa., An., Ar., and Az. at the Los Angeles public school in September 2014.  Ant. was in sixth grade, and the quadruplets were in fourth grade.  Appellant gave all five children permission to participate in a program called "Operation School Bell," which provides students with school supplies including uniforms, shoes, books, toys, and a backpack.  During Operation School Bell, Crowder saw An. take a toy, and appellant later discovered that Az. had taken an extra pair of shoes.  Az. and Ar. testified at trial that appellant put the quadruplets on "backpack restriction" after these incidents so they could no longer conceal items in their backpacks; they had to carry their supplies to and from school in their hands.

5

With appellant's permission, Crowder again took the quadruplets to Operation School Bell during the following school year, on Thursday, October 8, 2015.  They all received school supplies, including backpacks.  The quadruplets' fifth grade teacher, Robin Frazier, testified that she saw them walking home that afternoon.  Frazier became "concerned" when she noticed that "three of them were way up ahead," and An. was walking back toward the school.  As An. approached her, Frazier heard him "mumbling something about he was going to get the backpacks."  Frazier then saw An. "dig out two backpacks from under a bush" and noticed school supplies strewn along the sidewalk.

Frazier walked with An. to the other quadruplets and told them to put the school supplies back in the backpacks and take them home.  The quadruplets responded by asking Frazier to call appellant, "because she had told them not to bring backpacks home" and "was going to be really upset with them."  They seemed "scared and sort of evasive."  Frazier told them again to take the supplies home, and said appellant could get rid of the backpacks if she did not want the quadruplets to have them.  After sending the quadruplets on their way with the backpacks and other supplies, Frazier called Crowder and asked her to call appellant "so that the quadruplets would not be in trouble."  Crowder testified that she called appellant to apprise her of the situation.  Appellant "sounded frustrated" and told Crowder that she did not want the quadruplets to have backpacks.  Later that afternoon, Crowder noticed that the backpacks had been returned to the school.

Crowder and Frazier both testified that none of the quadruplets attended school the following day, Friday, October 9,

6

2015.  When the quadruplets returned to their classroom on Monday, October 12, 2015, Frazier noticed that they were unusually quiet.  Frazier also saw that Aa., Ar., and Az. had black eyes.  The combination of the quadruplets' unusual behavior and bruising led Frazier to suspect child abuse.  She called Crowder to her classroom; Crowder observed that the quadruplets were "very quiet" and saw "remnants of black eyes" on Aa., Ar., and Az.  Crowder told Frazier, a mandated reporter, to report her suspicions to the authorities.

Los Angeles County Sheriff's deputy Marlena Martinez responded to the school to investigate.  Martinez spoke with the quadruplets separately.  She spoke to Ar. first. He had bruising around his left eye and told Martinez that he was only able to answer questions pertaining to school.  Martinez next spoke to Az., who also had bruising and swelling on her face.  Az. cried during the questioning and told Martinez that the beads she wore in her hair caused the injuries to her face. Az. "spontaneously" added, "My mom didn't punch me."  Martinez next spoke to Aa.; she noticed that he had a scratch on his face. Aa. was "standoffish" and told Martinez that she could speak to his mother about how he got the scratch.  Martinez spoke to An. last.  She noticed a large scar on his hand, and a scratch on his arm.  Martinez also looked at An.'s back and "saw old scars that were consistent with some type of like whipping."  An. told Martinez that appellant had struck him with an extension cord.  An. further stated that appellant had punched Aa. and Ar. because they had come home with backpacks.  An. told Martinez that appellant had punched him in the past, and that he sometimes feared her.

7

A social worker took An., Ar., and Az. (but not Aa.) to the Los Angeles County/USC Medical Center. Nurse practitioner Shana Cripe testified that she immediately noticed bruising on the children's faces. Cripe then met with each of the children individually, interviewed them, and examined them. During her examination of An., Cripe documented and photographed red linear and loop marks on his buttocks and left flank, "multiple hyperpigmented overlapping loop marks on his right upper hip, hip area, and upper thigh," and a "scabbed abrasion on the inside of the mucous membrane of his lip."[4] Cripe testified that loop marks, which can be caused by cords, belts, or hangers, "are very specific for abuse" because they indicate "a large injury in two separate directions, so there's no way it's accidental." An. told Cripe that appellant "punches us" and hit him with a cord every day; he attributed the lip wound to being hit with appellant's fist. Cripe concluded that An.'s statements were consistent with the marks she observed and with a history of ongoing physical abuse.

Cripe documented and photographed a "loop-like pattern mark" on Ar.'s thigh; loop marks on his hip, buttocks and mid-back, "similar to" An.'s; a "big circular scar on his left chest"; "blue bruises underneath each eye"; "bruising and abrasions above his left eye"; and "another blue bruise on the side of his face." Ar. told Cripe that all of the marks were "birth marks," and "kept repeating that he wasn't hurt." Cripe testified that Ar.'s exam was consistent with physical abuse and inconsistent with his stated history of "birth marks." Specifically, the facial bruising was consistent with being punched in the face within the past week.

---

[4]Cripe's photographs of An. and the other children were admitted into evidence.

Cripe documented and photographed similar marks and scarring in similar locations on Az., including blue bruising on the left side of her face. Though Az. did not have any "perfect loop marks," Cripe testified that the marks she saw "made [her] suspect that [Az.] possibly was hit in the exact same manner that the boys were." Az. repeatedly told Cripe that she was not hurt and did not have any bruises. Cripe nevertheless concluded that all three children likely had been abused.

Detective Jeffrey Jackson of the Los Angeles County Sheriff's Department interviewed An., Ar., and Az. separately at school the following day, October 13, 2015. An. told Jackson that the quadruplets had gotten into trouble due to the backpack incident. An. further told Jackson that appellant had spanked them with an electrical cord and hit them with her fist. An. drew a picture of the hallway where the electrical cord was kept, and showed Jackson linear marks and scars "in various stages of healing" on his back.

Jackson testified that Ar. told him that appellant hit him with an extension cord after the backpack incident, and had hit him with the cord on other occasions as well. Ar. demonstrated how appellant held the cord; Jackson took a photograph that was shown to the jury and admitted into evidence. Ar. showed Jackson a mark on his leg from the cord, and said the bruising on his eye was due to appellant punching him with her fist. During her interview, Az. told Jackson that appellant struck the quadruplets with an electrical cord she kept in the hallway and had punched her in the eye. Recordings of Jackson's interviews with Ar. and Az. were played for the jury and admitted into evidence; Jackson testified that "there was an issue with the recording" of An.'s interview. A recording of a subsequent

9

forensic interview of An. was played for the jury and admitted into evidence.

All four quadruplets and their older brothers Ant. and Ti. were placed in foster care in November 2015. On December 3, 2015, the criminal court issued a protective order preventing any contact between appellant and the quadruplets.

All four quadruplets testified at trial. Az. and An. both testified that appellant struck them. Az testified that appellant punched Aa. and Ar. in the nose the day they received the backpacks. She further testified that appellant "whooped" the quadruplets with an extension cord "once or twice a month," and once punched Az. in the eye. An. testified that appellant "whooped" him with a cord and punched him, though he also stated that appellant never "whooped" him or hit him with her fist.

Aa. and Ar. testified that appellant never struck them inappropriately. Aa. testified that appellant only ever spanked the quadruplets with an open hand when they did something "really bad." Aa. denied that appellant punched the quadruplets with her fist or hit them with an electrical cord. The prosecutor impeached him with prior testimony he gave in dependency court, when he stated that appellant struck him "hard" with a closed fist "a lot." Aa. stated that his prior testimony was the result of feeling pressured in dependency court. Ar. testified that appellant never punched him or gave him a black eye. He also denied having scars or marks on his body. The prosecutor impeached him with contrary testimony from dependency court.

B. *Abduction and Violation of Protective Order*

Foster parent Paula Smith-Bull testified that Aa. and Az. were placed in her home in February 2017. Smith-Bull was

aware of the protective order prohibiting appellant from contacting the quadruplets and attempted to follow it. She was also aware that a social worker recently had informed Aa. and Az. that they would not be reuniting with appellant; Smith-Bull testified that both children became "withdrawn" after that conversation.

On February 22, 2017, about two or three days after the children's conversation with the social worker, Smith-Bull allowed Aa. and Az. to walk to school as they normally did. Smith-Bull went to the school later that day for an awards assembly and was surprised to find that Aa. and Az. were not at school. Smith-Bull notified the principal, who called the school police and the local sheriff's station. Smith-Bull formally reported Aa. and Az. missing. Az. testified that she and Aa. "went with my mom," who picked them up near their elementary school and drove them to an apartment where they stayed with appellant, their adult sister Cornesha, and others for a few days.

Sheriff's detective Daniel Starkey testified that he was assigned to look for Aa. and Az. on February 24, 2017. Using department resources, he located a phone number associated with appellant and placed a "ping" on it to monitor the location of the phone using the number. Starkey explained that a ping can give a location within about 1,000 to 1,500 meters while the phone is on. After investigating several pings without success, Starkey called the phone on February 24, 2017. Cornesha answered. Starkey told Cornesha that Aa. and Az. were missing and asked to speak to appellant. Cornesha "became extremely agitated" and told Starkey that appellant was in Michigan. Cornesha hung up on Starkey; thereafter, the phone was turned off.

11

Starkey testified that the phone sent several pings from the Inglewood area on February 26, 2017. Starkey contacted deputy sheriff Larry McGee and his partner, Carlson, briefed them on the case, and sent them to a shopping center in the vicinity of the pings. McGee testified that he saw a vehicle matching the description he was given parked at the shopping center. McGee also saw appellant, Cornesha, and Az. getting in the vehicle. McGee and his partner pulled up behind the vehicle and detained appellant, Cornesha, and Az. While appellant was in the backseat of the patrol car, McGee heard her yell, "They ran away and we were gonna take them back tomorrow."

When Starkey arrived on the scene, he attempted to speak to appellant and Cornesha, but they were both "uncooperative." No one, including Az., told Starkey where Aa. was or seemed concerned about his whereabouts. Starkey was informed on March 3, 2017 that Aa. had been found.

On rebuttal, DCFS social worker Mercedes Mendoza testified that Ant. told her that he was with Aa. and Ti. at the shopping center and fled the scene when he saw appellant and Cornesha being arrested.

II. *Defense Evidence*

A. *Corporal Injury*

Pediatrician Gagik Khoylyan examined all four quadruplets in October 2014 for well-child visits, and examined Ar. on October 7, 2015 for a skin issue. Dr. Khoylyan did not record or report any suspected abuse.

Brian Palmer testified that he was a resource specialist teacher at Rosewood. He worked with An., who had an "individualized education program" (IEP), three to five mornings each week. Palmer had no concerns about bruises or marks on

An. He never contacted DCFS about An., the other quadruplets, or Ant.

Ant., Ti., and Cornesha all testified that appellant never struck or abused them or the quadruplets. Ant. acknowledged that he had told a court in the family's previous home state of Kentucky that appellant had struck him with a cord and a belt, but he stated that he had been lying then and the real perpetrator had been his older brother, To. Ti. and Cornesha testified that To. physically abused his younger siblings, until appellant removed To. from the home. The quadruplets also testified that To. abused his siblings, including striking them with his fists and objects and forcing An. and Ar. to jump from a second-story window. All of appellant's children further testified that the quadruplets often inflicted marks on one another by fighting among themselves and with their older siblings. Cornesha testified that none of the quadruplets had black eyes when they went to school on October 12, 2015. She also testified that Aa. and Az. told her that police officers told them they would be taken to the police station if they did not say that appellant abused them.

Deputy sheriff Fabian Moore testified that he and his partner, deputy sheriff Todd Mohr, went to Rosewood on October 12, 2015 in response to a "mutual aid" request from the Los Angeles Police Department or other directive from their dispatcher. They subsequently went to appellant's apartment. Mohr testified that Rosewood was within the city of Los Angeles, not West Hollywood, and he was not aware of any such mutual aid request. Mohr further testified that he spoke to Cornesha, Ti., and Ant. at appellant's apartment and did not receive any information from them that led him to conclude that appellant

13

abused the quadruplets.  Mohr arrested appellant for child abuse on the directive of deputy sheriff Marlena Martinez.

DCFS emergency response social worker Mary Lester testified that she responded to Rosewood on October 12, 2015. Lester, who is trained to assess children's credibility, interviewed the quadruplets separately in a conference room.  The children were "very well composed," and none of them told her that appellant abused them.  Lester testified that she "wasn't concerned that there were black eyes" and "wasn't impressed that the children had been harmed by an adult or anyone, for that matter."  One of the law enforcement officers there told her that An. had disclosed abuse to him.  Lester recalled asking An., "Why didn't you tell me that?"; An. told her he had been scared.  Lester "felt like she needed to further interview him and assess him," because she thought he might have special needs, and she also had to speak with appellant's other children to complete her investigation.  Lester therefore went to appellant's apartment with Moore and Mohr.  All of the children denied abuse by appellant, and Lester believed them at that time.

Lester subsequently took the quadruplets to a clinic to be assessed by medical staff; she stated that "marks were noted" during the examinations.  Lester had not asked the children to disrobe when she interviewed them because they were at school at the time.  She stated that the abuse allegations were substantiated based on the medical professionals' opinions.  All four quadruplets told her they wanted to go home, however, and they did not fear appellant.

Deputy District Attorney Oksana Sigal testified that she was assigned to the case from October 2015 to December 2017. Sigal helped schedule the children's forensic interviews, which

she also observed through one-way glass. She first personally interacted with the quadruplets in February 2016, right before they were scheduled to give testimony at a preliminary hearing. Sigal testified that she met them in a conference room in the presence of a DCFS social worker. Sigal stated that she was never alone with any of the quadruplets. Sigal did not tell Az. or Ar. that she was acting as their attorney or would be representing them in court. She also denied telling them "to say what the police told them to say when they were at West Hollywood station"; she stated that she told them to tell the truth, like she told every witness or victim in her cases.

B.    *Abduction and Violation of Protective Order*

Ti. testified that Aa. and Az. told him that they did not like being in foster care. At some point, Ti. helped them make a plan to leave. Appellant was not involved in the plan. Az. was scared, but she and Aa. both were happy to see Ti. on February 24, 2017.

Cornesha testified that she went to a park near the family's apartment to exercise on February 25, 2017; she did that every Saturday. While she was there, Az. unexpectedly arrived on the bus. Cornesha spent about 30 minutes with Az. before putting her back on the bus. Cornesha told Az. to go back to her foster home and call the police when she got there. Cornesha did not call the police even though she knew they were looking for Az.; she called Az.'s social workers and left a message.

Cornesha testified that Az. knew that Cornesha would be at the Inglewood shopping center the following day. Az. approached Cornesha and appellant in the parking lot about five minutes after appellant arrived. The police arrived within a minute or two after that, while Cornesha was hugging Az., crying, and trying to figure out what to do. Cornesha was aware

15

of the protective order prohibiting contact between appellant and the quadruplets and did not arrange for Az. to meet appellant. Cornesha did not see Aa. or Az. in appellant's vehicle that day. Ant. denied being present at the shopping center with Ti. and Aa. and telling Mercedes Mendoza that he had been there.

## DISCUSSION

I.      *Corporal Injury Convictions*

Appellant contends the corporal injury convictions must be reversed due to the court's failure to instruct the jury on the lesser included offense of misdemeanor battery or with CALCRIM No. 331 concerning witnesses with developmental, cognitive, or mental disabilities.  We disagree.

A.      *Misdemeanor Battery Instruction*

1.      *Background*

During the jury instructions conference, the court observed that "simple assault and battery" were lesser included offenses of corporal injury.  The People stated that they were pursuing "an all or nothing theory" and were not requesting instruction on any lesser included offenses.  The court then said to appellant:  "I'm required to instruct on lesser-included offenses.  You need to hit the books to fully understand what that is.  [¶]  I do not have to give those instructions if the defense theory of the case is inconsistent with those defenses.  [¶] So, for example, in this case . . . my impression is that the defense case is that Ms. Jackson, you, the defendant, did not strike the kids in any way, shape, or form.  Either it happened the way the People say it happened by punching and hitting with the cord or it didn't happen at all.  [¶] And if that is the case, then there is no need for me to instruct the jury on lesser-included offenses because either it was the felony committed or it was no crime at all committed.  [¶]  I'm

16

gonna leave you with that. Take a look at what you need to take a look at. I will double check to see what duty I have to instruct regardless of that. Certainly there is a line of authority that says instructing on lesser-included offenses is not required if it is inconsistent with the defense case or not supported by the defense case." Appellant responded, "I did research that, and you are correct in your observation of the defense, and I'm asking that that not be included." Before concluding the conference, the court reiterated that it would "double check and make sure that I'm right that I don't have to do that."

When the parties revisited the jury instructions a few days later and discussed verdict forms, the court informed the parties that it agreed with them "that there is no basis to instruct the jury on verdict forms that have lesser and greater-included crimes." The People then clarified, "I am not asking that lessers be given, but I am not objecting to them being given." The court asked appellant, "Ms. Jackson, you do not want lesser-included offenses to be given?" She responded, "Correct." The court then stated, "I tend to agree. I'm not sure the evidence supports it 'cause of your all or nothing theory of your defense. But if there was evidence to support it, I might have to give it regardless whether you wanted me to, Ms. Jackson, but I am finding that the evidence doesn't support the lesser-included offenses based on your theory as we described all or nothing."

The court instructed the jury with a modified version of the pattern instruction for corporal injury to a child, CALCRIM No. 822, Inflicting Physical Punishment on a Child. The modification, proposed by the People and requested by both parties, added, "It is not unlawful for a parent to spank a child for disciplinary purposes with an object other than the hand. The

17

punishment, however, must be necessary and not excessive in relation to the individual circumstances." After closing arguments, the court additionally instructed the jury with a modified version of CALCRIM No. 3405, Parental Right to Punish a Child, which it opined "is the better definition to capture what is legal and not legal than the paragraph regarding spanking" it added to CALCRIM No. 822. It did not instruct the jury on any lesser included offenses of corporal injury. The jury found appellant guilty of two of the four counts of corporal injury, acquitted her on the third, and hung on the fourth.

        2.    *Analysis*

Battery (§ 242) is a lesser included offense of corporal injury to a child (§ 273d). (*People v. Valdez* (2002) 27 Cal.4th 778, 787.) A trial court has a sua sponte duty to instruct on a lesser included offense if there is substantial evidence that the defendant is guilty only of the lesser offense. (*People v. Chestra* (2017) 9 Cal.App.5th 1116, 1121.) Substantial evidence is that from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater offense. (*Ibid.*) Where such substantial evidence exists, the trial court must instruct on the lesser included offense even if it is inconsistent with the theory of defense or "'when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.'" (*Ibid.*) We review de novo the question whether the trial court improperly failed to instruct on a lesser included offense. (*Id.* at p. 1122.)

Before we reach the merits of that question, we address respondent's contention that appellant invited and therefore may not challenge any instructional error. Under the invited error doctrine, "a defendant may not invoke a trial court's failure to

instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence." (*People v. Barton* (1995) 12 Cal.4th 186, 198; see also *People v. Horning* (2004) 34 Cal.4th 871, 905; *People v. Souza* (2012) 54 Cal.4th 90, 114.) Respondent argues that the invited error doctrine applies here, because appellant pursued an all-or-nothing defense and asked the court not to instruct the jury on lesser included offenses. We are not persuaded. As the Supreme Court explained in *People v. Barton*, *supra*, 12 Cal.4th at p. 198 (emphasis added), the invited error doctrine applies where "the defendant persuades a trial court not to instruct on a lesser included offense *supported by the evidence.*" Here, the trial court expressly found, and we agree, that substantial evidence did not support instruction on a lesser included offense. The invited error doctrine therefore does not apply. We accordingly consider whether the trial court erred in failing to instruct on battery.

We conclude it did not. Section 273d "requires the defendant to inflict a cruel or inhuman corporal punishment or injury upon a child and the actual result is an injury resulting in a traumatic condition." (*People v. Cockburn* (2003) 109 Cal.App.4th 1151, 1160.) "It is *injury* resulting in a traumatic condition that differentiates this crime from lesser offenses," including battery (*People v. Gutierrez* (1985) 171 Cal.App.3d 944, 952 [emphasis in original]); a traumatic condition is "a wound, or external or internal injury . . . whether of a minor or serious nature, caused by physical force." (§ 273.5, subd. (d); see also *People v. Gutierrez, supra*, 171 Cal.App.3d at p. 953; CALCRIM No. 840.) Battery requires only a willful or unlawful touching of

19

another person done in a harmful or offensive manner.  (*People v. Chenelle* (2016) 4 Cal.App.5th 1255, 1263; see also § 242; CALCRIM No. 960.)

The record did not contain substantial evidence that appellant committed battery but did not inflict corporal injury on An. and Ar.  As appellant describes the evidence in her opening brief: "The forensic examinations of three of the quadruplets revealed that An[.] had multiple abrasions on his chest, scars on his arms and the back of his neck, and loop marks on his hips, thighs, flanks, and upper arm. An[.] told Cripe that appellant punched and hit 'all of us' with a cord every day.  [¶]  Ar[.] also had scars in a loop pattern on his thigh, and red loop marks on his back and buttocks.  He had bruises under each eye, and a cut on the inside of his lip.  The bruises and cut could have been caused by being punched in the face.  [¶] Az[.] had similar injuries to her brothers, including loop marks in the same areas as her brothers and bruises on her cheek."  No reasonable jury could conclude from this evidence that appellant committed battery but did not injure or cause traumatic injury to the children.  The children had abrasions, bruising, scarring, and loop marks, all of which evince the injury and traumatic condition that distinguish corporal injury from battery.

Appellant emphasizes that the jury only convicted her on two of the four counts and argues it is therefore "reasonably probable that the jury would have reached a more favorable result" had it been instructed on battery.  (See *People v. Moye* (2009) 47 Cal.4th 537, 556-557; *People v. Watson* (1956) 46 Cal.2d 818.)  The fact that the jury was unable to reach a verdict on one count and acquitted appellant on another does not demonstrate that a more favorable result was reasonably probable on the

20

remaining two counts, for which appellant herself acknowledges strong evidence of abuse. If anything, it suggests that appellant's strategy of pursuing an all-or-nothing defense was prudent on the facts of this case.

Appellant also argues that the court's sua sponte duty to instruct on battery arose not after the close of evidence but "after the prosecution introduced a new theory of guilt in closing argument." The court decided to add CALCRIM No. 3405 to the instructions after the jury asked for clarification of the word "reasonable" as used in CALCRIM No. 822.[5] During discussion with the parties, the court noted that the People had argued appellant "went too far, and that begs the question of whether it was reasonable or not" before deciding to give CALCRIM No. 3405. Appellant argues that this instruction "on a parent's right to discipline . . . did not substitute for instructions on the lesser-included offenses [*sic*]." Her reliance on *People v. Whitehurst* (1992) 9 Cal.App.4th 1045 (*Whitehurst*) in support of this argument is misplaced.

In *Whitehurst*, *supra*, 9 Cal.App.4th 1045, 1049, the issue was whether the court had a sua sponte duty to instruct the jury regarding a parent's right to discipline his or her child during a parent's trial for inflicting corporal injury in violation of section 273d. In concluding that such a duty existed, the court rejected

---

[5]CALCRIM No. 822 uses the word reasonable in its definition of natural and probable consequence: "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." It uses the word "reasonably" in the third element of the offense: "When the defendant acted, she was not reasonably disciplining a child." It appears from context that the jury was concerned with the latter.

the Attorney General's contention that the defendant's theory that he had disciplined his stepdaughter Natalie and did not hit her hard could be divided into two separate defenses: that Natalie did not suffer a traumatic condition, and that he was simply disciplining her.  (*Id.* at p. 1050.)  The court explained that "whether the corporal punishment falls within the parameters of a parent's right to discipline involves consideration of not only the necessity for the punishment but also whether the amount of punishment was reasonable or excessive.  Reasonableness and necessity therefore are not two separate defenses but rather two aspects of the single issue of parental right to discipline by physical punishment." (*Ibid.*)  The court further noted that a parent may reasonably discipline a child without committing battery.  (*Ibid.*)  In light of its conclusion that the trial court prejudicially erred by failing to sua sponte instruct on the concepts embodied in CALCRIM No. 3405, the *Whitehurst* court did not address the appellant's alternative argument that the trial court erred by failing to instruct on the lesser included offense of battery.  (*Id.* at pp. 1047, 1052, fn. 4.)

Pointing to these portions of *Whitehurst*, appellant asserts that "[t]he jury instruction on a parent's right to discipline did not substitute for the right to an instruction on the lesser-included offense."  *Whitehurst* does not support that proposition.  "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.)  Moreover, the *Whitehurst* court emphasized that the instruction on parental discipline "was of critical importance" in the case, because "there was no dispute that defendant hit Natalie, and the only real issue in [the] case was whether the punishment was necessary and, if so, whether it was reasonable."  (*Whitehurst*,

*supra*, 9 Cal.App.4th at. 1050.)  Here, whether appellant struck the children was the disputed issue; appellant's defense was that she never struck the children.  *Whitehurst* accordingly is not instructive.

      B.    *CALCRIM No. 331*

          1.    *Background*

During trial, evidence was introduced that An., the child who made the most damning abuse disclosures, attended special education classes.  Brian Palmer, Rosewood's "resource specialist teacher," testified that he had worked with An. three to five mornings per week pursuant to An.'s IEP.  Palmer further explained that an IEP "is a document mandated by the Federal Individuals with Disabilities Education Act that allows for children with certain disabilities to get their education in what's called the 'least restrictive environment' that supports their educational needs," and stated that An. "came to me in my room for extra help."  Social worker Mary Lester, who interviewed the quadruplets, testified that she thought "maybe [An.] needed further assessment maybe, because at that juncture I started to think that maybe he had special needs."  There was no further evidence regarding the nature of An.'s IEP or any disability or impairment with which he may have been diagnosed.

Based on the above testimony,[6] appellant requested that the court instruct the jury with CALCRIM No. 331.  That

---

[6]Appellant also asserted that "Linda Crowder, the People's first witness, referenced [An.] having an I.E.P. and disability."  On cross-examination, Crowder testified only that she had no recollection in response to appellant's questions about whether Crowder remembered "being in a conference with [appellant] and other school staff regarding [An.'s] IEP" or discussing with

23

instruction, authorized by and tracking the language of section 1127g,[7] provides:  "In evaluating the testimony of a person with a (developmental disability[,]/[or] [a] (cognitive[,]/[or] mental[,]/[or] communication) impairment), consider all of the factors surrounding that person's testimony, including his or her level of cognitive development.  [¶]  Even though a person with a developmental disability[,]/[or] [a] (cognitive[,]/[or] mental[,]/[or] communication) impairment)[,] may perform differently as a witness because of his or her level of cognitive development, that does not mean he or she is any more or less credible than another witness.  [¶]  You should not discount or distrust the testimony of a person with a developmental disability[,]/[or] [a] (cognitive[,]/[or] mental[,]/[or] communication) impairment)[,] solely because he or she has such a (disability/[or] impairment)."

The People objected on the grounds that there was no evidence that An. "suffers from any serious affliction, cognitive or mental disability."  The trial court sustained the objection, finding that "[t]here's been no competent evidence of a disability that warrants that instruction."

2.      *Analysis*

We review a trial court's refusal to give a requested instruction de novo.  (*People v. Quarles* (2018) 25 Cal.App.5th 631, 634.)  "'A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence

---

appellant and Palmer "[An.] not having a backpack to take home, IEP documentation."

[7]Section 1127g provides that "In any criminal trial or proceeding in which a person with a developmental disability, or cognitive, mental, or communication impairment testifies as a witness, upon the request of a party, the court shall instruct the jury" with, essentially, CALCRIM No. 331.

sufficient to deserve jury consideration.' [Citation.] "'[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference.'" [Citation.]" (*People v. Byers* (2021) 61 Cal.App.5th 447, 456, 457 (*Byers*).) The relevant question here is whether the evidence in the record to which appellant points—testimony that An. had an IEP and received unspecified special education services and speculation regarding An.'s possible "special needs"—supports the inference that An. had a developmental disability or cognitive, mental, or communication impairment.

The terms "developmental disability" and "cognitive, mental, or communication impairment" are not defined in section 1127g or CALCRIM No. 331. As both appellant and respondent recognize, when the meaning of a statute is unclear, the proper course is to "look to a variety of extrinsic aids, including the objects to be achieved, the evils to be remedied, legislative history, the statutory scheme of which the statute is a part, contemporaneous administrative construction, and questions of public policy." (*People v. Ramirez* (2009) 45 Cal.4th 980, 987; *People v. Keeper* (2011) 192 Cal.App.4th 511, 520 (*Keeper*).) The courts in *People v. Catley* (2007) 148 Cal.App.4th 500 (*Catley*) and *Keeper*, *supra*, 192 Cal.App.4th 511 performed this analysis. As explained in *Catley* and largely echoed by *Keeper*: "Section 1127g was added in 2004 by the Legislature, which articulated its purpose as follows: 'It is the intent of the Legislature to enact legislation protecting the rights of developmentally disabled persons and other dependent persons who are witnesses in criminal cases and ensuring that they are given equal access to the criminal justice system.' (Stats. 2004, ch. 823, § 1.) The Legislature defined a dependent person as 'any person who has a

25

physical or mental impairment that substantially restricts his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities or whose physical or mental abilities have significantly diminished because of age.' (*Id.*, § 2; see Evid. Code, § 177.)" (*Catley, supra,* 148 Cal.App.4th at p. 508; see also *Keeper, supra,* 192 Cal.App.4th at pp. 520-521.) *Keeper* further concluded, from the legislative history and definition of "dependent persons," that "the Legislature intended section 1127g to apply to persons whose developmental disability, or cognitive, mental, or communication impairment, causes them to be dependent on others for care," and did not intend it to apply to individuals who "generally engaged in normal daily activities without assistance." (*Keeper, supra,* 192 Cal.App.4th at p. 521.)

 *Byers, supra,* 61 Cal.App.5th 447, recently disagreed with *Keeper* and read section 1127g to be more broadly applicable, "without limitation to dependent persons," because "some sections of the legislation that added section 1127g [to the Penal Code] do not involve, or are not limited to, dependent persons." (*Byers, supra,*61 Cal.App.5th at p. 457.) Indeed, while much of the bill enacting section 1127g referred to "dependent persons with a substantial cognitive impairment," the portion adding section 1127g was worded much more broadly than other sections amended by the bill. For instance, Evidence Code sections 710, 765, and 767 were amended to add reference to "a dependent person with a substantial cognitive impairment." (See Stats. 2004, ch. 823, §§ 1, 2, 6, 8, 14). Had the Legislature wished to similarly limit the applicability of section 1127g, it would have done so.

Even construing section 1127g and CALCRIM No. 331 broadly, however, the evidence does not support an inference that An. had a "developmental disability" or "cognitive, mental, or communication impairment." Lester's speculation that An. might have unspecified "special needs" does not establish that An. in fact had any, and his possession of an IEP and receipt of special education services does not necessarily mean An. had a "developmental disability" or "cognitive, mental, or communication impairment." As appellant notes in her brief, IEPs are prepared for children with a wide range of special needs, including "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . ., orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities." (20 U.S.C. § 1401(3)(A), defining "child with a disability".) A child with a learning difference such as dyslexia or dyscalculia or an orthopedic impairment may benefit from special education services but may not be said to have a "developmental disability" or "cognitive, mental, or communication impairment." Without additional information about An.'s IEP, the "extra help" Palmer provided, or the basis for Lester's suspicion that An. had "special needs," the jury could not reasonably infer that An. had a "developmental disability" or "cognitive, mental, or communication impairment."

Even if such an inference were reasonable, we would find harmless any error in the court's failure to instruct with CALCRIM No. 331. Appellant's theory of the case was that she never struck the quadruplets. She argued that Rosewood staff fabricated the abuse claims out of animus toward the family, and

27

law enforcement and DCFS pressured or coerced some of the quadruplets into making statements and giving testimony to support the false abuse claims. She contends that the court's refusal to give CALCRIM No. 331 was federal constitutional error because it precluded her "from presenting the defense theory that the reason [An.], alone, reported abuse to police was because he was more easily pressured and coerced into making a false statement than his siblings." She asserts that "[a]bsent the instruction, the prosecutor was able to capitalize on [An.'s] statements, arguing that he reported the abuse more than his siblings 'for whatever reason,' and urging the jury to convict appellant based on the testimony of a single witness, pursuant to CALCRIM No. 301. . . . The prosecutor's arguments erroneously implied there was no basis for evaluating [An.'s] testimony differently than that of any other witness."

A key goal of CALCRIM No. 331 is to ensure that the jury does *not* evaluate the testimony of a witness with a disability or impairment differently than that of another witness. "CALCRIM No. 331 informs the jury it should not decide whether an individual with a developmental disability or cognitive impairment is a credible witness based solely on the disability or impairment. Rather, the instruction advises the jury the level of the witness's developmental disability or cognitive impairment is one factor it must consider." (*Catley*, *supra*, 148 Cal.App.4th at p. 508.) In other words, the instruction undermines appellant's argument that An.'s alleged disability or impairment rendered him less credible and more susceptible to coercion, which she made to the jury despite the omission of CALCRIM No. 331. Moreover, the People did not argue that the jury should rely exclusively on An.'s testimony to prove the corporal injury

28

allegations. To the contrary, they cautioned the jury, "before you conclude that the testimony of one witness proves a fact, carefully review, think about, consider everything that you saw and heard from this witness stand over the past few months."

Additionally , the jury instructions must be considered as a whole. (See *Byers*, *supra*, at p. 458.) Here, the court instructed the jury with standard instructions on assessing the credibility of witnesses (CALCRIM Nos. 105 & 226) and evaluating conflicting evidence (CALCRIM No. 302), as well as an instruction regarding prior testimony given by the quadruplets when they were 10 years old or younger (CALCRIM No. 330). The jury thus was well aware that it could "consider anything that reasonably tends to prove or disprove the truth or accuracy" of An.'s testimony, including his ability to perceive the things about which he testified, his demeanor on the stand, his age, and whether he may have been influenced by others involved in the case. Any error in the omission of CALCRIM No. 331 would be harmless.

## II. *Abduction Convictions*

Appellant argues that her convictions for abducting Aa. and Az. must be reversed because the trial court deprived her of a defense and directed a verdict for the prosecution by misinstructing on the element of malice, excluding hearsay testimony regarding the alleged sexual abuse of Az. in foster care, and failing to sua sponte instruct on the defense of necessity. We reject these contentions.

### A. *Malice Instruction*

#### 1. *Background*

Appellant was charged with two counts of abduction under section 278, which provides: "Every person, not having a right to custody, who maliciously takes, entices away, keeps, withholds,

29

or conceals any child with the intent to detain or conceal that child from a lawful custodian shall be punished . . . ." The court instructed the jury that the offense required proof that appellant acted with specific intent: "For you to find a person guilty of this crime, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The act and specific intent required are explained in the instruction for that crime." (CALCRIM No. 252.) The instruction the court gave for the crime was the pattern instruction, CALCRIM No. 1250, Child Abduction: No Right to Custody. The specific intent it described and defined was malice: "The defendant is charged in Counts FIVE AND SIX with child abduction without a right of custody in violation of Penal Code section 278. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant maliciously took, kept, withheld, or concealed a child from her lawful custodian; [¶] 2. The child was under the age of 18; [¶] 3. When the defendant acted, she did not have a right to custody of that child; [¶] AND [¶] 4. When the defendant acted, she intended to detain or conceal the child from the child's lawful custodian. Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else." Appellant raised no objection to these instructions in the trial court.

During their closing argument, the People argued that they had proven all four elements of abduction as set forth in CALCRIM No. 1250. As to malice, they argued: "Someone acts maliciously when he or she intentionally does a wrongful act. . . . . Intentionally did the wrongful act. Ms. Jackson knew she didn't have custody of her children on February 24th, 2017, and she

30

acted with the lawful [*sic*] intent. . . . No force or anything had to be used, and it didn't have to be dramatic. It wasn't dramatic, from what we heard. But it still fits the elements of the crime and was against the law. . . . Ms. Jackson knew what she was doing, which is why she's been charged with a crime."

Appellant also addressed malice during her closing argument. She partially quoted the definition from CALCRIM No. 1250 and argued that she did not intend to disturb, defraud, annoy, or injure Aa. or Az. She further argued that she "didn't have the ability to follow" the no-contact court order, because she "saw Az[.] for moments. I had to process my own emotions. This is the real world; not a piece of paper. In the real world, I was looking at my almost 12-year-old daughter I hadn't seen in forever. In the real world, I saw my own two daughters standing in front of each other crying. In the real world I was trying to process what happens next, and we were arrested. Me and Cornesha were arrested, and in some aspect, so was Az[.], except me and Cornesha could make phone calls, get mail, and visit." In rebuttal, the People responded to appellant's argument that she did not intend to disturb, defraud, annoy, or injure by pointing out that the definition of maliciously listed the unlawful intentions in the disjunctive using an "or" rather than in the conjunctive using an "and." They further argued, "Ms. Jackson by taking her children, letting them get in the car, which is what the evidence showed you happened, intentionally did a wrongful act. Ms. Jackson knew she wasn't supposed to let those kids get in the car and drive them away and be with them for the next 48 hours, admittedly probably having fun, watching TV, braiding hair, etc. That's the wrongful act. And doing the wrongful act on purpose, that's the malicious part, as the law says right here."

31

2. *Analysis*

Appellant now contends that the child abduction convictions "were the product of an unconstitutional application of Penal Code section 278."[8]  However, it appears her concern lies primarily with CALCRIM No. 1250 and only indirectly with section 278.  She argues that CALCRIM No. 1250 "effectively created an unconstitutionally impermissible presumption of malice based upon the 'undisputed' facts that appellant took a child under 18 years of age in violation of a court order.  The instruction erroneously permitted the jury to convict her based solely on the commission of the 'wrongful act' of detaining or concealing a child in violation of the court order," regardless of any justification, excuse, or mitigating circumstances underlying her actions.  We review her claims of instructional error and removal of an issue from the jury's consideration de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Appellant's claims rest upon on her assertion that the definition of "maliciously" in CALCRIM No. 1250 is "incomplete."  She asserts that the court should have added language to

_____

[8]Respondent asserts, in a single sentence, that "because appellant's constitutional challenge to section 278 requires analysis of the facts of this particular case, this Court should deem it forfeited for failure to raise the issue in the trial court."  The case respondent cites, *In re Sheena K.* (2007) 40 Cal.4th 875, supports this proposition only in the context of as-applied constitutional challenges to probation conditions. Moreover, incorrect or incomplete instructions that allegedly affect an appellant's substantial rights are reviewable even if no objection was raised in the trial court.  (*People v. Denman* (2013) 218 Cal.App.4th 800, 812; § 1259.)  We accordingly consider the merits of appellant's contentions.

32

CALCRIM No. 1250 to require the People to prove not only that she intentionally did a wrongful act, but also that she did so without justification, excuse, or mitigating circumstances. As a result of this alleged incompleteness, she argues, the jury had "no option other than to find 'malice' established by the mere proof of a taking in violation of a custody order," because "[t]he taking of the child will necessarily result in a violation of the existing orders, and that violation will necessarily constitute a 'wrongful' act within the 'ordinary, everyday' meaning of the word." Therefore, "[i]t is 'impossible' not to have acted 'maliciously' in connection with the taking of the child," and "[t]he prosecution is relieved of the burden of proof on the malice element, because its ultimate burden is reduced from three elements to two."[9] These contentions are unavailing.

As the Supreme Court explained in the context of section 278.5, a child abduction statute that also requires a defendant to act maliciously, the malice required is that defined in section 7, subdivision (4), which "'import[s] a wish to vex, annoy, or injure another person, or an intent to do a wrongful act.'" (*People v. Neidinger* (2006) 40 Cal.4th 67, 79 (*Neidinger*).) This definition is substantively identical to that contained in CALCRIM No. 1250, which thus accords with the law: "Someone acts maliciously

---

[9]As indicated above, CALCRIM No. 1250 sets forth four elements that the People must prove beyond a reasonable doubt to establish the offense of child abduction with which appellant was charged. Appellant's claim that the People's burden of proof decreased "from three elements to two" appears to be a consequence of her nearly verbatim duplication of arguments examined in an unpublished opinion addressing CALCRIM No. 1251, a similar instruction that lists three elements for a similar child abduction offense.

33

when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else." Appellant claims additional language is needed to clarify that "intentionally" means "without justification, excuse, or mitigating circumstance." Whether a defendant acted without justification, excuse, or mitigating circumstance is a factual issue on which he or she bears the burden of raising a reasonable doubt, not part of the offense the People must prove. (See *Neidinger*, *supra*, 40 Cal.4th at pp. 74-75, 79.)

Contrary to appellant's claim, CALCRIM No. 1250 did not leave the jury with no option but to convict her of child abduction based solely on her violation of the protective order. The instruction required the People to prove beyond a reasonable doubt that appellant acted maliciously when she deprived DCFS of its right to custody of Aa. and Az. by intentionally keeping, withholding, or concealing the children. The People thus were required to prove that appellant intentionally did one or more of these wrongful acts, not merely that she violated the order.

Appellant contends that *People v. Diaz* (2005) 125 Cal.App.4th 1484 (*Diaz*) compels the opposite conclusion. In *Diaz*, the defendant was charged with evading a pursuing police officer while driving with willful or wanton disregard for the safety of persons or property, in violation of Vehicle Code section 2800.2, subdivision (a). (*Diaz, supra*, 125 Cal.App.4th at p. 1486-1487.) To prove the element of willful or wanton disregard for safety, the prosecution had to prove that the defendant committed three or more traffic violations during the pursuit. (*Id.* at p. 1486.) The prosecution selected as one of those three offenses failure to yield the right of way for an emergency vehicle,

34

specifically the one in pursuit; the jury found defendant guilty. (*Id.* at p. 1487.)  On appeal, the defendant argued that the conviction should be reversed because it was impossible to commit the offense of evading a police pursuit without also failing to yield to the pursuing vehicle and therefore the prosecution only had to prove two underlying traffic violations instead of three. (See *ibid.*)  The appellate court agreed.  (*Ibid.*; see also *id.* at pp. 1490-1491.)  It held that allowing the necessarily included offense of failure to yield as one of the three violations the prosecution had to prove "would mean there is automatically one qualifying violation . . . whenever the People have proven the offense of evading pursuit.  In other words, the People are given a 'freebie,' and their burden is reduced from three violations to two violations." (*Id.* at p. 1491.)  The court found the error was prejudicial and reversed the defendant's conviction.  (*Id.* at pp. 1491-1492.)

Appellant asserts that "[t]he same problem arises in child abduction cases where the child is the subject of custody orders and the jury is instructed on malice in the form it was instructed here. . . .  It is 'impossible' not to have acted 'maliciously' in connection with the taking of the child."  We are not persuaded. First, *Diaz* is inapposite because it involved a statute that required the prosecution to prove three predicate offenses to establish an element of the charged offense; the statute at issue here lacks any such requirement.  Second, unlike the overlapping offenses in *Diaz*, it is possible to violate a custody order without wrongful or malicious intent.  Under some circumstances, including those appellant argued were present here, a reasonable jury could conclude that a defendant violated a custody order inadvertently or with permissible intentions.

We reject appellant's contention that CALCRIM No. 1250 "effectively created an unconstitutionally impermissible" presumption of malice based upon the "undisputed" facts that she took a child under 18 years of age in violation of a court order. CALCRIM No. 1250 did not require the jury to find or presume that appellant acted with malice in the event the jury found she violated the custody order when she kept, withheld, or concealed Aa. and Az. The instruction did not refer to the custody orders and did not tell the jury it was required to make presumptions or inferences. Although the jury could find from the evidence that keeping, withhold, or concealing Aa. and Az. violated the custody order, and that violating the custody order was a "wrongful act," these findings of fact alone were insufficient to compel a conviction under the court's instructions. As discussed above, the People were still required to prove that appellant intentionally did the alleged wrongful act. The jury could have acquitted appellant if it had found the People failed to meet their burden of proving beyond a reasonable doubt that she intentionally violated the custody order. This could have occurred if, for example, there was insufficient proof she knew about the custody order or if the custody order was ambiguous. The instruction did not create a mandatory presumption requiring the jury to find appellant acted with malice solely because she violated the custody order.

B.    *Exclusion of Testimony & Necessity Defense*

1.    *Background*

While Az. was on the stand, appellant asked[10] her if she had told anyone she wanted to leave the foster home of Paula Smith-Bull. The court sustained the People's hearsay objection,

---

[10]The court permitted appellant to directly examine witnesses called by the People.

36

but allowed appellant to ask Az. why she wanted to leave the foster home. Az. answered that she did not like it there, and the court sustained the People's relevance objections to appellant's further inquiries as to why.

When Smith-Bull testified several days later, appellant asked her, "Regarding the male figure that you testified frequented your home, isn't it true that you knew he was using Az[.] for his sexual pleasures?" The court sustained the People's objection and told appellant, "There is no foundation for that." Appellant then asked if Smith-Bull had "any knowledge that Az[.] was concerned with the male person that you had visiting your home and him inappropriately touching her." The court sustained the People's numerous objections, told appellant "no more regarding any claim that is implied by your question that Az[.] was a victim of any inappropriate touching," and admonished the jury that questions were not evidence.

Outside the presence of the jury, the court asked appellant to explain the basis of her queries regarding the alleged sexual assault of Az. Appellant stated, as the court summarized, that she had "heard secondhand from other family members that Az[.] was being sexually assaulted while in the care of Ms. Smith-Bull." She also informed the court that Cornesha had alluded to the alleged abuse at the preliminary hearing.[11] Appellant made

---

[11]At the preliminary hearing, Cornesha testified that Az. "told me that she ran away because she was getting molested at her foster home." The People objected on hearsay grounds, and appellant responded that the statement was "offered to prove that [Az.] experienced that mental or physical state" and had reached out to Cornesha at the park for protection. The magistrate stated, "it's a stretch," but admitted the statement under Evidence Code 1250 as "corroboration that the minor ran

no further offer of proof.  After hearing argument, the court ruled that appellant was "not to question any other witnesses" about the alleged sexual assault of Az. unless she presented additional evidence in an Evidence Code section 402 hearing.  The court further ordered, "You are not going to question the witnesses about why she ran away.  That raises the issue or possibility or question that she was being sexually assaulted.  That you are prohibited from doing."

The issue arose again during the defense case, in a conference outside the presence of the jury.  The court observed that the reasons Aa. and Az. ran away from Smith-Bull's foster home would be relevant only if the People planned to argue that appellant committed the abduction offense by taking or enticing away the children.  The People stated that they planned to argue only that appellant kept, withheld, or concealed Aa. and Az.  On the basis of that representation, to which the court said it was "going to hold them," the court ruled that any testimony as to why Aa. and Az. ran away was irrelevant.  Appellant argued that "the reason they chose to run away is significantly relevant because it goes to the state of mind of both Az[.] and Aa[.]," and asserted that in the absence of such evidence, "it just seems like [Az.] was some crazy kid just running all over town."  The court stated it understood that argument, but ruled that any limited relevance in that regard would be outweighed by the undue consumption of time and possibility of confusing the jury.  (See Evid. Code, § 352.)

---

away as opposed to being taken."  On cross-examination, Cornesha testified that Az. had disclosed to her "touching from her foster dad."  Cornesha further testified that she did not call the police upon receipt of this information.

The People adhered to their promise during closing, arguing only "that the evidence shows that Ms. Jackson intended to detain or conceal the children from their lawful custodian, [DCFS]." Appellant argued that she had "happened upon" Az. and was in her presence for mere "moments" before law enforcement arrested appellant in front of Az. "to show me who was boss." She further contended that law enforcement "weren't looking" for Aa.; "[i]f he believed that Aa[.] was with me, you think he would have canvassed the area."

      2.    *Analysis*

Appellant now contends the court erred in excluding evidence of Az.'s alleged abuse, both because it was relevant to appellant's state of mind and because it prevented appellant from presenting a necessity defense. Appellant further contends that the court erred in failing to sua sponte instruct on the necessity defense, which she asserts was supported by substantial evidence and was "the only viable defense strategy remaining after [she was] deprived of any meaningful opportunity to defend against a finding of 'malice.'" We reject these contentions.

We review the trial court's decision to exclude evidence for abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 745.) "The decision to exclude evidence 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].' [Citation.]" (*Ibid.*) Appellant has not made that showing here. The court excluded the evidence at various points as lacking foundation, irrelevant, unduly time-consuming, and potentially confusing. So long as one of those bases was valid, we need not evaluate every alternative rationale for excluding the evidence.

(See *People v. Bacon* (2010) 50 Cal.4th 1082, 1103.)  In light of the arguments raised here, we begin with relevance.

Only relevant evidence is admissible.  (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  As the trial court observed, evidence concerning the alleged sexual abuse would have been relevant if the People sought to prove that appellant physically took Az. from her foster home, assuming there was also evidence that appellant was aware of the alleged abuse.  However, whether appellant took Az. was not a disputed fact in the case.  To the extent that the evidence may have been relevant to Az.'s state of mind and provided a basis for her actions, as appellant argued, the court did not abuse its discretion in concluding that this limited probative value was substantially outweighed by undue consumption of time and the possibility of confusing the issues before the jury.  (Evid. Code, § 352.)

Appellant contends that the court abused its discretion because the evidence was "relevant to appellant's state of mind in determining whether she acted with 'malice,' a critical element of the prosecution's proof required to convict her of child abduction." Respondent argues that appellant forfeited this contention because she did not cite that basis of admissibility in the trial court.  (See Evid. Code, § 354; *People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)  Appellant, who acknowledges that she did not seek to admit the evidence on this basis, asks us to nonetheless consider the argument because the exclusion of the evidence deprived her of due process and a meaningful opportunity to present a defense—the defense of necessity.  Relatedly, she

contends the court erred by failing to instruct the jury on the defense of necessity.

The defense of necessity is in essence a public policy determination that an individual should not be punished for a crime he or she committed to avoid greater harm.  (See *People v. Heath*  (1989) 207 Cal.App.3d 892, 900-901.)  "To justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he [or she] did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.)  A trial court has a sua sponte duty to instruct on an affirmative defense if there is substantial evidence supportive of the defense and the defense is not inconsistent with the defendant's theory of the case. (*People v. Brooks* (2017) 3 Cal.5th 1, 73.)

Here, the only evidence appellant cites in support of a necessity defense is the evidence the court excluded—allegations that Az. suffered sexual abuse in her foster home.  Excluded evidence is not substantial evidence.  Appellant asserts that the court should have admitted the evidence, thereby supporting a necessity defense, to ensure that her due process rights as a self-represented litigant were protected.  We are not persuaded.  "Pro. per. litigants are held to the same standards as attorneys." (*Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543.) "[T]he cost of recognizing a criminal defendant's right to self-representation may result "'in detriment to the defendant, if not outright unfairness.'"  [Citation.]  But that is a cost that we allow

defendants the choice of paying, if they can do so knowingly and voluntarily." (*People v. Mickel* (2016) 2 Cal.5th 181, 206.) Appellant, who competently represented herself throughout a lengthy trial, gave no indication that she intended to present a defense of necessity. To the contrary, her defense to the abduction charge was that she encountered Az. mere moments before she was arrested for abduction. The trial court was not obligated to anticipate and suggest to appellant theories of defense or admissibility to ensure that her due process rights were protected.

Appellant argues that *People v. Minifie* (1996) 13 Cal.4th 1055 (*Minifie*) compels the opposite result. In *Minifie*, a represented defendant charged with "assaultive crimes" sought to introduce evidence of threats made against him by people other than the victim to support his theory of self-defense. (*Minifie, supra*, 13 Cal.4th at p. 1060.) The trial court excluded the proffered evidence, ruling that it was inadmissible character evidence or, alternatively, that it was substantially more prejudicial than probative under Evidence Code section 352. (*Id.* at pp. 1062-1063.) The defendant proceeded with his self-defense argument, but was unable to use the excluded evidence to support it. (See *id.* at pp. 1063-1064.) The jury found him guilty of unlawful possession of a firearm by a felon and assault with a deadly weapon. (*Id.* at p. 1064.)

On appeal, the defendant argued that the threats made by third parties were admissible to prove his own state of mind and the reasonableness of his fear of the victim; both the Court of Appeal and the Supreme Court agreed. (*Minifie, supra*, 13 Cal.4th at pp. 1065-1066.) The Supreme Court further held that the trial court abused its discretion under Evidence Code section

352. (*Id*. at p. 1070.) Adopting the analysis of the Court of Appeal, it reasoned, "'None of the considerations supporting the discretionary exclusion of relevant evidence substantially outweighed the probative value of the evidence at issue here. Presentation of evidence at the heart of the defense would not have represented an "undue" consumption of time. There was no risk of prejudice associated with the evidence. "The prejudice referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] . . . and which has very little effect on the issues." [Citation.] Evidence bearing on [defendant's] state of mind was highly probative, and had no "unique tendency" to evoke any emotional bias against the prosecution. Evidence that [defendant] might have had reason to fear for his life would not have "confused the issue." It would have further illuminated the situation the jury was required to evaluate.'" (*Id*. at pp. 1070-1071.) The Supreme Court concluded the error was prejudicial as to the assault convictions, because "the excluded evidence was central to the defense" such that "the claim of self-defense was not compelling" in its absence. (*Id*. at p. 1071.) The court held that the excluded evidence "would have strengthened the defense considerably," as the jury may have found that the third-party threats "justified a stronger reaction to [the victim's] punch than would otherwise be reasonable." (*Ibid*.)

This case is not analogous to *Minifie*. Here, appellant did not apprise the court that she wanted to introduce the evidence to support a necessity defense, nor did she attempt to advance a materially weakened necessity defense in its absence. The suggestion that a child was sexually abused in a foster home is precisely the type of evidence that tends to evoke an emotional

43

bias while having very little effect on the defense that appellant advanced as early as her opening statement. The trial court did not err by excluding the evidence or not instructing the jury on the defense of necessity.

III.     *Cumulative Error*

Appellant argues that the cumulative effect of the errors she has identified requires reversal of her convictions. Because we found no errors, we reject this claim.

IV.     *Section 12022.1 Enhancement*

Appellant contends that the trial court violated her constitutional right to a jury trial on every fact essential to punishment by finding that she committed the abduction offenses while on bail. Because the court made the finding rather than presenting the issue to the jury, she argues that the enhancement must be stricken. The record indicates that the trial court already struck the enhancement. Accordingly, this issue is moot.

A.     *Background*

The information alleged, pursuant to section 12022.1, that appellant committed the child abduction offenses while she was on bail in case SA091444, a previous iteration of the instant case. No evidence regarding appellant's bail status was introduced at trial, the jury was not instructed on section 12022.1, and the allegations were not included on the verdict forms. At a hearing approximately one month after trial, the court raised the issue of the on-bail enhancement allegations as a "clean-up item" that "is appropriately addressed now." The court explained to appellant, "you don't have a right to a jury trial on that issue. But it is a factual determination that the court has to make at sentencing with the appropriate findings to be made." The court took

44

judicial notice of the relevant court files and, based on their contents, found appellant "guilty of violating Penal Code section 12022.1." Appellant raised no objections to the procedure or the findings. The court later ordered the imposition of sentence suspended and granted appellant formal probation of three years. It made no mention of section 12022.1.

B.    *Analysis*

Section 12022.1 provides for an enhanced sentence when a defendant commits a felony ("secondary offense") while released on bail or his or her own recognizance after being charged with a previous felony ("primary offense"). The enhancement allegation "shall be pleaded in the information or indictment which alleges the secondary offense . . . and shall be proved as provided by law." (§ 12022.1, subd. (c).) If the enhancement is so proven, the defendant "shall be subject to a penalty enhancement of an additional two years [in state prison], which shall be served consecutive to any other term imposed by the court." (§ 12022.1, subd. (b).) Additionally, subdivision (f) provides that, if the defendant is sentenced to probation on the primary offense and convicted of the secondary offense, "any sentence for the secondary offense shall be enhanced as provided in subdivision (b)." (§ 12022.1, subd. (f).) The primary offenses in this case were the corporal injury offenses; the secondary offenses were the child abduction offenses. There is no indication that appellant's probation term was extended as a result of the court's findings. We interpret this as the trial court's exercise of its discretion to strike the section 12022.1 enhancement under section 1385. (See *People v. Meloney* (2003) 30 Cal.4th 1145, 1155-1156.)

Appellant nevertheless contends that the enhancement must now be stricken as unconstitutional under *Apprendi v. New*

*Jersey* (2000) 530 U.S. 466, *Blakely v. Washington* (2004) 542
U.S. 296, and *Descamps v. United States* (2013) 570 U.S. 254.
Since the enhancement already was stricken or otherwise not
applied, we need not and do not wade into the morass of this
complex issue.

V.      *Fines and Fees*

Appellant argues that the court erred under *People v.
Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) by imposing fines
and fees pursuant to section 1202.4, section 1465.8, and
Government Code section 70373 without first holding an ability-
to-pay hearing.  She requests a remand with directions for the
trial court to stay these fines and fees "unless the People can
prove appellant has the ability to pay."[12]

A.      *Background*

At the sentencing hearing, after the court indicated an
intent to set a restitution hearing, appellant made the following
statement: "[R]egarding the volunteer or the community service,
that costs money for me to be attached with that.  Probation costs
money.  Community service costs money.  The fines and costs cost
money.  The court ordered me to be in LA costs money [*sic*] when
I have housing and have resided in another state prior to now.
Everything costs money.  And somehow this court wishes me to
expend all of that in honoring the orders made of the court. I just

---

[12]Currently pending before the Supreme Court is *People v.
Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019,
S257844, in which the parties have been asked to address two
issues: "Must a court consider a defendant's ability to pay before
imposing or executing fines, fees, and assessments?  If so, which
party bears the burden of proof regarding defendant's inability to
pay?"

think it's too much.  I think it's too much."  She asked the court to exercise its discretion and stay restitution.

The court explained that it did not "have the discretion to disregard victim restitution based on your inability to pay."  It continued, "The areas that I do have discretion based on your inability to pay, to suspend, if you will, or to wipe out are the areas of the restitution fine, which I would affix at the minimum of $300 now, and the domestic violence fine, which is a $400 fine, which I would affix now.  The notion of your ability to pay can mean - - there is some misunderstanding.  I recognize that right now you may not have the cash in your bank account to write a check for these amounts.  But that does not mean under the law that you do not have the ability to pay them over time.  Over time would consist for [*sic*] the period of probation.  If at the end of the term of probation you still are unable to pay those amounts, then the court often will order them waived after that, to the extent they are waivable.  . . . You have the physical ability to be employed and earn money.  I recognize that being a convicted felon impairs that ability to some extent.  But all of the defendants that come before me face those same challenges and eventually they are overcome or at the end of probation ultimately determine that they in fact  . . . do not have the ability to pay them in full. . . .  When you ask me that I stay them, yes, it is stayed as a practical matter until you have the ability to pay.  Whether I ultimately order a portion of it waived or not will depend on truly your inability to pay at all throughout the term of probation."

Appellant then informed the court that she did not have stable housing in California, but had access to housing in Michigan.  She explained, "I don't have anything here.  I'm living

47

with someone. I have an entire residence somewhere else. I don't have ability [*sic*] to work here to make the desired income to care for my family with these convictions. So this court is essentially rendering me homeless." The court stated that it understood that appellant "would have free housing in Michigan and that housing is a significant expense." It ruled, however, that it would not allow probation to be transferred to Michigan immediately, but stated that decision was without prejudice to appellant later making a showing that comparable services were available in Michigan.

The court ultimately ordered appellant to pay a restitution fine, which it fixed "at the minimum amount of $300 [(§ 1202.4)]; a probation revocation restitution fine in the same amount, which I order stayed unless your probation is revoked and the sentence is imposed [(§ 1202.45)]; a criminal conviction assessment of $30 [(Gov. Code, § 70373)]; a criminal court security [assessment] of $40 [(§ 1465.8)]; and the cost of probation to be determined by the probation officer subject to an ability to pay hearing, as well as a domestic violence payment of $400, again subject to . . . an ability-to-pay hearing [(§ 1203.097)]." After the clerk advised the court that the domestic violence fee was now $500, the court imposed a $500 fee, "subject to your ability to pay over the term of probation." The court ordered appellant to return in approximately one month "for restitution hearing setting, ability-to-pay hearing, if necessary, and firearms compliance."

The appellate record does not contain a transcript of or any documents pertaining to a further restitution or ability-to-pay hearing.

48

B.    *Analysis*

In *Dueñas, supra*, 30 Cal.App.5th 1157, Division Seven of this court held that the imposition of assessments under section 1465.8 and Government Code section 70373 without a determination that the defendant has the ability to pay them "violates due process under both the United States Constitution and the California Constitution." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.)  It further held that the execution of restitution fines imposed under section 1202.4 must be stayed "until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Id.* at p. 1172.)  Division Two of this court subsequently concluded that *Dueñas* was wrongly decided in *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946.  Courts across the state have joined one side or the other of this ongoing dispute, which, as noted above, is currently pending before the Supreme Court.  Rather than take a position, we will assume for purposes of this appeal that the principles of *Dueñas* are applicable here.

There is no error with respect to the restitution fine imposed under section 1202.4.  The court explicitly advised appellant that it was required to impose the fine but would stay execution of the fine and possibly even waive it, depending upon appellant's ability to pay.  Indeed, the court scheduled an ability-to-pay hearing shortly after the sentencing hearing.  These procedures are consistent with those contemplated in *Dueñas.*

Even if appellant's due process rights were violated with respect to the assessments imposed under section 1465.8 and Government Code section 70373, we are not persuaded that appellant was prejudiced.  As the trial court correctly recognized, ability to pay is not a static inquiry.  (E.g., *People v. Kopp, supra,*

49

38 Cal.App.5th at p. 96 ["[T]he trial court should not limit itself to considering only whether Appellants have the ability to pay at the time of the sentencing hearing. As both Appellants will be serving lengthy prison sentences, it is appropriate for the court to consider the wages that both men may earn in prison."].) Several cases accordingly have held that no prejudice occurs if a convicted defendant has the ability to earn wages while in prison. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) The same principle applies even more strongly where, as here, appellant is not incarcerated and therefore has the opportunity to earn well above the $12 to $56 per month an incarcerated person can. (See *People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035.)

As the court observed, appellant, who was 38 years old at the time of sentencing, had "the physical ability to be employed and earn money" during her three-year term of probation. The assessments at issue totaled $70. Nothing in the record reasonably suggests that appellant would be unable to pay this sum, approximately $1.95 per month for the duration of her probation, to satisfy the obligations, particularly if she successfully transferred her probation to a jurisdiction in which she had low-cost housing available. Moreover, unlike the defendant in *Dueñas*, she is not facing a recurring cycle of debt or repeated incarceration solely because of her financial status. (See *Dueñas,* supra*, 30 Cal.App.5th at p. 1164 & fn. 1.) Additionally, the trial court contemplated reassessment of appellant's ability to pay throughout her period of probation. On this record, we conclude that any *Dueñas* error was harmless.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


COLLINS, J.

We concur:


MANELLA, P. J.


CURREY, J.